UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            Case No.

ALL FUNDS DEPOSITED INTO THE UNITED
STATES DEPARTMENT OF JUSTICE'S SEIZED
ASSET DEPOSIT FUND FOR 19-DCI-000029
UNDER THE MARCH 1, 2019 RESTRAINING
ORDER ISSUED IN CASE NO. 18-CR-62 (E.D.
WIS.),

        Defendant.

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE IN REM

The United States of America, by its attorneys, Matthew D. Krueger, United States

Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United States

Attorney for this district, alleges the following in accordance with Supplemental Rule G(2) of the

Federal Rules of Civil Procedure:

### Nature of the Action

1.     This is a civil action to forfeit property to the United States of America, under

Title 18, United States Code, Section 981(a)(1)(A), for violations of Title 18, United States

Code, Sections 1956(h) and 1957.

### The Defendant In Rem

2.     The defendant property is all funds deposited into the United States Department

of Justice's Seized Asset Deposit Fund for 19-DCI-000029 under the March 1, 2019 Restraining

Order issued in Case No. 18-CR-62 (E.D. Wis.).

3.     More specifically, the defendant property comprises all funds deposited to date, and to be deposited in the future, into the United States Department of Justice's Seized Asset Deposit Fund ("SADF"), for asset identification number 19-DCI-000029, under the March 1, 2019 Restraining Order (the "Restraining Order") issued in Case No. 18-CR-62 (E.D. Wis.) (the "related criminal case"). A copy of the Restraining Order is attached hereto as Exhibit 1.

4.     The deposited funds consist of recurring installment payments that Sonag Ready Mix ("SRM") has been directing, and continues to direct, to the United States Marshals Service ("USMS"), consistent with the Restraining Order entered in the related criminal case.

5.     SRM has been making, and continues to make, those recurring installment payments under a Redemption Agreement and Promissory Note between SRM and Sonag Company, Inc. ("Sonag") under which SRM is purchasing, from Sonag, Sonag's one-half interest in SRM. Copies of the Redemption Agreement and Promissory Note between SRM and Sonag are attached hereto as Exhibit 2 and Exhibit 3, respectively.

6.     Since the March 1, 2019 issuance of the Restraining Order as to Sonag in the related criminal case, SRM has been making weekly installment payments, as they become due under the Redemption Agreement and Promissory Note, to the USMS. The USMS, in turn, has been holding those payments in the SADF, an escrow account for funds that the United States has seized for forfeiture pending a declaration or order forfeiting the funds or ordering their return.

7.     As of September 27, 2019, a portion of the defendant property—consisting of approximately $95,192.40 in payments under the Redemption Agreement and Promissory Note that SRM has made to the USMS since the March 1, 2019 entry of the Restraining Order in the related criminal case—is in the custody of the USMS.

8.      SRM continues to make additional payments under the Redemption Agreement, Promissory Note, and Restraining Order to the USMS.  The United States anticipates that SRM will continue making these payments, as they come due under the Redemption Agreement and Promissory Note, until the United States moves to lift the Restraining Order in the related criminal case.

9.      The United States has agreed to move to lift the Restraining Order in the related criminal case as follows:

      A.     If the sentencing court in the related criminal case imposes a term of imprisonment upon Brian Ganos ("Ganos"), then within fourteen days after Ganos reports to prison, the United States will move to lift, on a prospective basis only, the March 1, 2019 Restraining Order; or

      B.     Alternatively, if the sentencing court in that case imposes no term of imprisonment, then within eight weeks after Ganos's sentencing, the United States will move to lift, on a prospective basis only, the March 1, 2019 Restraining Order.

10.     The United States, Ganos, and Sonag have agreed that the United States may forfeit the funds paid to the USMS while the Restraining Order is in effect but that after the Restraining Order is lifted, SRM's payments under the Redemption Agreement and Promissory Note between SRM and Sonag may once again be directed to Ganos on behalf of Sonag.

**Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

12.     This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

13.     Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for Forfeiture

14.     Sonag, as a whole, was involved in a money laundering conspiracy as well as money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h), 1956(a)(l)(B)(i), and 1957, respectively.

15.     Because property involved in the commission of money laundering conduct is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A), and Sonag was involved in such money laundering conduct in a substantial manner, it follows that all right, title, and interest in Sonag itself is subject to forfeiture.

16.     The property interests of Sonag that are subject to forfeiture include the defendant property, namely, the recurring installment payments (a) that SRM owes Sonag under the Redemption Agreement and Promissory Note in exchange for Sonag's sale to SRM of Sonag's one-half interest in SRM and (b) that SRM pays to the USMS under the Restraining Order, while that order is in effect in the related criminal case.[1]

## Facts

**Brian Ganos and Sonag Company**

17.     Brian Ganos was the sole owner and president of Sonag.

18.     Before February 19, 2018, Sonag had a 50% ownership interest in SRM.  An individual having the initials N.R. owned the other 50% of SRM.

---

[1]  In this civil forfeiture case, the United States seeks forfeiture of the defendant property only, and not of Sonag Company, Inc. itself.

4

**The set-aside fraud scheme and conspiracy**

19.     Between in or about July 2010 and August 2016, Ganos knowingly conspired with Sonag and others to participate in a scheme to defraud the United States by using deceitful and dishonest means to impair, impede, and defeat the lawful function of its agencies in the implementation, execution, and administration of set-aside programs to help small businesses obtain federal procurement funds.

20.     The essence of that conspiracy was to operate companies, including companies C3T and Nuvo Construction Company, Inc. ("Nuvo"), with straw owners who qualified as a socially and economically disadvantaged individual or as a service-disabled veteran, but who did not actually control the companies.  The conspirators then fraudulently obtained small business program certifications as to the status of the companies and used those certifications to obtain over $200 million in federal, state, and local contract payments to which they were not entitled. Through the conspiracy and scheme, the conspirators enriched themselves, undermined the small business programs, and deprived honest small businesses of opportunities for work.

**The conspiracy to launder the proceeds of the set-aside fraud scheme in violation of 18 U.S.C. § 1956(h) and the use of Sonag accounts, personnel, and property to facilitate that money laundering conspiracy**

21.     Sonag and Ganos also conspired, with each other and others, to launder the proceeds of the set-aside contract fraud scheme, committed in violation of the federal mail and wire fraud statutes, Title 18 United States Code, Sections 1341 and 1343, respectively, by engaging in financial transactions that involved use of, among other things, accounts of Sonag.

22.     Ganos and Sonag conducted those financial transactions in furtherance of the money laundering conspiracy in a manner intended to disguise and conceal, among other things:

        A.     The nature of those proceeds, namely, that they were obtained via the fraud scheme;

B. The source of those proceeds, namely, that they came from money paid under a set-aside contract to Nuvo or C3T;

C. The location of those proceeds, in that Ganos's movement of the funds from Nuvo and C3T accounts through accounts associated with Ganos-controlled entities – which included Sonag accounts – helped to conceal the ultimate location of the contract payments that originally had been paid to Nuvo and C3T; and

D. The true ownership of those criminally derived proceeds.

23. While conducting those transactions in furtherance of the money laundering conspiracy, Ganos and Sonag knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

24. Sonag and Ganos therefore engaged in money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), for the purpose of committing concealment money laundering transactions, in violation of Title 18, United States Code, Section 1956(a)(l)(B)(i).

25. Sonag facilitated that money laundering conspiracy by laundering $3,000,000 in proceeds of the fraud scheme through its corporate accounts.

26. Specifically, between January 2011 and May 2016, Ganos, Sonag, and others caused multiple financial transactions that transferred $3,000,000, which included proceeds of the fraud scheme, from Nuvo and C3T accounts to investment accounts held in Sonag's name.

27. The $3,000,000 in transfers from Nuvo and C3T accounts to Sonag accounts are traceable to proceeds and profits of the fraud scheme.

A. On January 12, 2011, Ganos signed a signature card, which identified himself and Sonag as the account owners of a Sonag account at Morgan Stanley ending in digits 7004 ("Sonag 7004").

B. Two days later, on January 14, 2011, Ganos caused three transfers to be made to the Sonag 7004 account, each for $1,000,000, for a total of

6

$3,000,000. Specifically, Ganos transferred $1,000,000 from a Nuvo account at BMO Harris ending in 5207 ("Nuvo 5207"), $1,000,000 from a C3T account at BMO Harris ending in 5125 ("C3T 5125"), and $1,000,000 from a C3T BMO Harris account ending in 5866 ("C3T 5866") to the newly opened Sonag 7004 account.

C.    The $3 million in Nuvo and C3T funds that Ganos transferred to the Sonag 7004 account were criminal proceeds and profits, traceable to the set-aside contract scheme that Ganos perpetrated through C3T and Nuvo.

D.    The first of these transfers – namely, the $1,000,000 transferred from Nuvo 5207 to the Sonag 7004 account in January 2011 – was funded by two earlier transfers of funds from a Nuvo BMO Harris account ending in 1990 ("Nuvo 1990"). First, in March 2010, Ganos transferred $600,000 from Nuvo 1990 to Nuvo 5207. That $600,000 is traceable to payments on federal set-aside contracts that Nuvo had received as part of the set-aside fraud scheme and conspiracy. Second, in October 2010, Ganos transferred $500,000 from Nuvo 1990 to Nuvo 5207. That $500,000 is also traceable to payments on federal set-aside contracts that Nuvo had received as part of the fraud scheme.

E.    The second of these transfers – the $1,000,000 transferred from C3T 5215 to the Sonag 7004 account in January 2011 – was funded by an earlier transfer of funds from C3T 5866 in October 2010. That $1,000,000 is traceable to payments on federal set-aside contracts that C3T had received as part of the set-aside fraud scheme and conspiracy.

F.    The third of these transfers – the $1,000,000 transferred from C3T 5866 to the Sonag 7004 account in January 2011 – is traceable to payments that C3T had received on federal set-aside contracts as part of the set-aside fraud scheme and conspiracy.

28.    Sonag was involved in the money laundering conspiracy offense, and substantive money laundering transactions, in a substantial manner. Specifically, Ganos caused Sonag to use Sonag's contract accountant, L.M., to make the financial transactions in furtherance of the money laundering conspiracy; L.M. made those financial transactions using Sonag's premises; and L.M. used Sonag bank accounts to receive $3 million in proceeds of the set-aside fraud scheme in furtherance of that money laundering conspiracy.

**Ganos and Sonag's use of Sonag accounts, personnel, and property to engage in additional money laundering transactions in violation of 18 U.S.C. § 1957**

29.    Between January 2015 and May 2016, Ganos used Sonag accounts to engage in seven additional monetary transactions that constituted unlawful financial transactions, in violation of Title 18, United States Code, Section 1957.

30.    At the time Ganos engaged in those monetary transactions, he knew that the transactions involved criminally derived property.

31.    Each of the transactions involved criminally derived property having a value greater than $10,000.

32.    The property involved in each of these monetary transactions was derived from mail fraud and wire fraud offenses committed as a part of the above-described set-aside contract fraud scheme and conspiracy.

33.    Each of these monetary transactions was therefore committed in violation of Title 18, United States Code, Section 1957.

34.    Each of these monetary transactions was a transfer from, and to, an account of Sonag.

35.    Those monetary transactions and transfers, set forth in detail in the below, cumulatively involved more than $3 million:

| Date | Description |
|---|---|
| January 8, 2015 | Transfer of various securities having a value of $857,884.35 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| January 9, 2015 | Transfer of various securities having a value of $1,248,254.94 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank |

| | |
|---|---|
| | USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| February 6, 2015 | Transfer of various securities having a value of $45,419.94 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| February 9, 2015 | Transfer of various securities having a value of $395,668.98 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| February 10, 2015 | Transfer of $41,950.00 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| February 11, 2015 | Transfer of various securities having a value of $461,741.78 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| May 24, 2016 | Transfer of $860,000 from UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA," to UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBBO USB Bank USA." |

36.     Sonag was involved in those seven substantive money laundering offenses, committed in violation of 18 U.S.C. § 1957, in substantial ways.  Specifically, Ganos caused Sonag to use Sonag's contract accountant, L.M., to make each of the charged money laundering transactions; L.M. made those transactions using Sonag's premises; and L.M. made those transactions exclusively using Sonag bank accounts.

**Sonag's Sale of, and Receipt of Installment Payments for, its Fifty-Percent Ownership Interest in Sonag Ready Mix**

37.     On February 19, 2018, Sonag and its sole owner, Brian Ganos, entered into a Redemption Agreement with SRM and N.R. under which Sonag and Ganos agreed to sell

9

Sonag's 50% ownership interest in SRM to SRM and N.R. In exchange, SRM and N.R. were obligated to pay the principal amount of $739,587.66 under a five-year-term Promissory Note bearing a 2.31% annual interest rate. Copies of the Redemption Agreement and the Promissory Note are attached hereto as Exhibit 2 and Exhibit 3, respectively.

38. Under the Promissory Note, the payments, with interest, are to total $825,000. The Promissory Note allows payment to be made at the rate of $3,173.08 per week.

39. N.R. and SRM had been regularly making these weekly payments of $3,173.08 since on or about March 9, 2018.

40. Since on or about March 1, 2019, SRM has been making these payments to the USMS, under the Restraining Order, and the USMS has, in turn, been depositing those payment funds into the SADF, to be held in escrow pending resolution of this case.

**Restraining Order entered as to the defendant property in the related criminal case**

41. On March 1, 2019, in the related criminal case, United States District Judge Pamela Pepper issued a Restraining Order that requires Sonag and Ganos to escrow the approximately $3,173 in weekly payments that Sonag is receiving, under the Redemption Agreement, from SRM as payment for Sonag's sale to SRM of Sonag's one-half interest in SRM. A copy of the Restraining Order is attached hereto as Exhibit 1.

42. The Restraining Order requires that all future payments due under the Redemption Agreement are to be directed to the USMS to be held in escrow for potential forfeiture.

43. The Restraining Order further requires that the USMS deposit those payments into the SADF for potential forfeiture, which deposited funds are the defendant property in this civil forfeiture case.

10

44.     Because property that facilitates money laundering is "involved in" money laundering and because, in turn, property that is involved in money laundering, including a business entity, is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A), all right, title, and interest in Sonag – including the recurring payments Sonag is receiving from SRM in exchange for Sonag's sale to SRM of Sonag's 50% ownership interest in SRM – are subject to forfeiture.

**Relevant procedural history of related criminal case against Ganos and others**

45.     On May 1, 2018, Ganos and Sonag were charged in a Superseding Indictment, in the related criminal case, with, among other things, conspiring with each other and others, including L.M., Sonag's contract accountant, to launder the proceeds of the aforementioned fraud scheme by engaging in financial transactions involving the use of, among other things, accounts of Sonag.

46.     On June 3, 2019, the United States filed a plea agreement in the related criminal case under which Ganos agreed to plead guilty to one count of wire fraud, as charged in count four, and one count of mail fraud, as charged in count ten, of the Superseding Indictment.

47.     In that plea agreement with Ganos in the related criminal case, the United States agreed to move to dismiss the fraud count and money laundering count of the superseding indictment, as those counts apply to Sonag, at the time of Ganos's sentencing, and to dismiss the original indictment in its entirety as it relates to Sonag.

48.     In the plea agreement, the United States and Ganos agreed, among other things, that the United States will lift the Restraining Order by a date certain following sentencing and that the United States will seek to forfeit only those funds that are in the United States' possession as of the date that the Restraining Order is lifted.

49.     Specifically, in paragraph 39 of Ganos's plea agreement, the United States and

Ganos agreed:

>    If the sentencing court imposes a term of imprisonment, then within fourteen days after the defendant reports to prison the government will move to lift, on a prospective basis only, the March 1, 2019 restraining order that the court entered in this case to escrow the approximately $3,173 in weekly payments that Sonag Company is receiving from Sonag Ready Mix ("SRM") as payment for Sonag Company's sale to SRM of Sonag Company's one-half interest in SRM.
>
>    Alternatively, if the sentencing court imposes no term of imprisonment, then within eight weeks after sentencing the government agrees to move to lift, on a prospective basis only, the March 1, 2019 restraining order.
>
>    In either event, the parties agree that: (a) the government is entitled to retain, and to the immediate entry of a preliminary order of forfeiture forfeiting as a directly forfeitable asset under 18 U.S.C. § 982(a), all of the money that has been paid into the government's escrow account under the court's March 1, 2019 restraining order up to the date when the government moves to lift the restraining order on a prospective basis and (b) the defendant will have the right to receive such payments that SRM makes for Sonag Company's sale to SRM of Sonag Company's one-half interest in SRM thereafter.

(R. 154 in the related criminal case) (paragraph breaks added).

50.     On June 7, 2019, in the related criminal case, Ganos pleaded guilty to one count

of wire fraud, as charged in count four of the Superseding Indictment, and one count of mail

fraud, as charged in count ten of the Superseding Indictment, in violation of 18 U.S.C. §§ 1341

and 1343, respectively.

51.     Thus, in the related criminal case, neither Ganos nor Sonag agreed to plead guilty,

or have pleaded guilty, to any money laundering offenses.

52.     Following entry of the plea agreement, but consistent with paragraph 39 of the

plea agreement in the related criminal case, the United States, Ganos, and Sonag have further

agreed that the United States will forfeit civilly, rather than criminally, all the sums that SRM has

paid, and will pay, to the USMS, for deposit into the SADF, under the Restraining Order until the United States moves to lift the Restraining Order consistent with paragraph 39 of the plea agreement. Ganos has also agreed not to file a claim, or to cause Sonag to file a claim, to all these sums that SRM has paid, and will pay, to the USMS under the Restraining Order until that order is lifted—which sums are the defendant property in this case.

## Warrant for Arrest In Rem

53.     Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the defendant property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## Claim for Relief

54.     The plaintiff repeats and incorporates by reference the paragraphs above.

55.     By the foregoing and other acts, Sonag, as a whole, was involved in a money laundering conspiracy as well as money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h) and 1957, respectively. Therefore, all right, title, and interest in Sonag – including the defendant property, namely, all recurring installment payments that SRM has been directing, and continues to direct, to the USMS, consistent with the Restraining Order entered in the related criminal case – are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that a warrant of arrest for the defendant property – all funds deposited into the United States Department of Justice's Seized Asset Deposit Fund for 19-DCI-000029 under the March 1, 2019 Restraining Order issued in Case No. 18-CR-62 (E.D. Wis.) – be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment declare the defendant property to be condemned and forfeited to the United States of America for disposition

according to law; and that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

Dated at Milwaukee, Wisconsin, this 1st day of October, 2019.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:
    s/SCOTT J. CAMPBELL
    SCOTT J. CAMPBELL
    Assistant United States Attorney
    Scott J. Campbell Bar Number: 1017721
    Attorney for Plaintiff
    Office of the United States Attorney
    Eastern District of Wisconsin
    517 East Wisconsin Avenue, Room 530
    Milwaukee, Wisconsin 53202
    Telephone: (414) 297-1700
    Fax: (414) 297-1738
    E-Mail: scott.campbell@usdoj.gov

**Verification**

I, Joel Nelson, hereby verify and declare under penalty of perjury that I am a Special Agent with the Department of Defense, Office of Inspector General – Defense Criminal Investigative Service ("DODIG-DCIS"), that I have read the foregoing Verified Complaint for Civil Forfeiture *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 17 through 52 of the Verified Complaint are true to my own knowledge.

The sources of my knowledge are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with DODIG-DCIS.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.


Date:  October 1, 2019          s/JOEL NELSON                           
                               Joel Nelson
                               Special Agent
                               Department of Defense–Office of Inspector General
                               Defense Criminal Investigative Service

15

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case No. 18-cr-62-pp

BRIAN L. GANOS, *et al.*,

        Defendants.

### RESTRAINING ORDER REQUIRING DEFENDANTS SONAG COMPANY AND BRIAN GANOS TO ESCROW ALL FUTURE PAYMENTS SONAG COMPANY RECEIVES FOR ITS SALE OF ITS INTEREST IN SONAG READY MIX

        The United States submitted an *ex parte* Application for Post-Indictment Restraining Order to Require Defendants Sonag Company and Brian Ganos to Escrow All Future Payments that Sonag Company Receives for the Sale of its Interest in Sonag Ready Mix under 21 U.S.C. §853(e), along with a supporting affidavit.

        Based on the information in the application and the affidavit, the court finds that there is probable cause to believe that if Sonag Company, Brian Ganos, or both are convicted of one or more of the money laundering conspiracy and spending laundering offenses charged in the superseding indictment, all right, title, and interest in defendant Sonag Company are subject to criminal forfeiture under 18 U.S.C. § 982(a)(1) on the ground that Sonag Company substantially facilitated, and was therefore was "involved in," one or more of those money laundering offenses.

        The court finds probable cause to believe that because defendant Sonag Company as a whole would be subject to forfeiture in that event, Sonag Company's and defendant Brian Ganos's rights to receive payments from

Sonag Ready Mix LLC ("SRM") and SRM's co-owner Nicholas Rivecca under a Redemption Agreement dated February 19, 2018 (between SRM, Sonag Company, and Brian Ganos, concerning Sonag Company's sale to SRM of Sonag Company's one-half interest in SRM) are subject to criminal forfeiture under 18 U.S.C. § 982(a)(1).

The court concludes that because there is probable cause to believe that defendant Sonag Company's rights to receive payments under the Redemption Agreement are subject to forfeiture, (a) any future installment payments that SRM is to make to Sonag Company, Ganos or both under the Redemption Agreement and (b) any funds now in the possession of Sonag Company or Ganos that consist of, or are traceable to, past installment payments under the Redemption Agreement are subject to mandatory post-indictment restraint under 21 U.S.C. § 853(e).

The court **GRANTS** the United States' *ex parte* Application for Post-Indictment Restraining Order to Require Defendants Sonag Company and Brian Ganos to Escrow All Future Payments that Sonag Company Receives for the Sale of its Interest in Sonag Ready Mix.

The court **ORDERS** that defendants Sonag Company and Brian Ganos shall, within three days of this order, direct Sonag Ready Mix, LLC to direct any and all future payments due under the Redemption Agreement to the United States Marshals Service ("USMS") pending further order of the court.

The court **ORDERS** that, within fourteen days of this order, defendants Sonag Company and Brian Ganos shall: (a) account for all installment payments that either or both of them have received to date from SRM under the Redemption Agreement and (b) turn over to the USMS, to be held in escrow for

potential forfeiture, any funds still in the possession of Sonag Company, Ganos or both that consist of, or are traceable to, such past installment payments.

The court **ORDERS** that the USMS shall promptly deposit (a) any future payments that the USMS receives from SRM under the Redemption Agreement, and (b) any funds that the USMS receives from Sonag Company, Brian Ganos or both under the paragraph immediately above, into the United States Department of Justice's Seized Asset Deposit Fund ("SADF"). The USMS shall hold the payments and funds that it deposits into the SADF under this paragraph in escrow for potential forfeiture or return upon resolution of this criminal case, including all asset forfeiture proceedings.

The court **ORDERS** that it shall retain jurisdiction of this matter for all purposes. The terms of this order shall remain in full force and effect pending further order of the court or entry of one or more judgments in this criminal case disposing of the monies at issue.

Dated in Milwaukee, Wisconsin this 1st day of March, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

3

# REDEMPTION AGREEMENT

THIS REDEMPTION AGREEMENT (this "Agreement") is made as of the 19 day of February, 2018 ("Effective Date"), by and among SONAG READY MIX, LLC, a Wisconsin limited liability company (the "Company"), SONAG COMPANY, INC. (the "Departing Member") and BRIAN GANOS ("Brian").

## RECITALS

WHEREAS, the Departing Member is a member of the Company and owns an interest (principally Class A Units) in the Company (all of Brian's interests and rights in the Company, whether Class A Units or otherwise, may be referred to in this Agreement as the "Interest"), and is a party to the Company's Operating Agreement entitled "Membership Unit Purchase Agreement" dated December 29, 1999 (the "Operating Agreement");

WHEREAS, Brian is the majority owner of Sonag Company, Inc.;

WHEREAS, the Departing Member and Brian desire to sell to the Company, and the Company desires to purchase from the Departing Member, the Interest, and the parties desire to terminate the Departing Member's relationship with the Company.

## AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants and promises herein contained, the parties agree as follows:

1. <u>Redemption of Interest</u>. Upon the execution of this Agreement and in exchange for the Redemption Consideration (as defined below), the Departing Member shall sell to the Company, and the Company shall purchase and redeem from the Departing Member, the Interest.

2. <u>Redemption Consideration</u>. In consideration of the Departing Member's sale of the Interest to the Company and the other covenants and agreements of the Departing Member in this Agreement, the Company shall, contemporaneously with the execution and delivery of this Agreement by the Departing Member, deliver to the Departing Member the Company's unsecured promissory note in the original principal amount of $739,578.66 (the "Note"). The Note shall be in a form mutually acceptable to the parties, shall bear interest at the rate of 2.31% per annum and shall provide for 5 annual payments of principal and interest equal to $165,000.00 per year ("Nominal Principal Payment") plus interest accrued to the date of payment, each of such payments, subject to the provisions described below and in paragraph 3, to be made not later than 120 days after the last day of the fiscal year of the Company, commencing with the fiscal year ending December 31, 2017, and continuing thereafter for the next four fiscal years (the final payment to be made following the Company's 2021 fiscal year). Where practical, annual payments will be divided into monthly or other periodic payments at the discretion of the Company. The payments to be made to Departing Member pursuant to this Section 2 and the Note are referred to herein as the "Redemption Consideration."

Exhibit 2

3. <u>Postponement of Redemption Consideration</u>. The Departing Member recognizes that lenders to the Company, business conditions at the Company or external forces may make it impossible or impracticable for the Company to timely make payments toward the Nominal Principal Payment. The Departing Member hereby consents to delay of payments towards the Nominal Principal Payment if the Company deems such delay necessary and/or appropriate for the Company's business, provided however, no such delay in payment shall reduce the payment(s) toward the Nominal Principal Payment if the delay would cause or allow Nick Rivecca to receive more in aggregate salary or compensation from the Company than the aggregate amount of the payment toward the Nominal Principal Payment. If the Company is eventually unable to pay the Note in full after paying all other creditors except Nick Rivecca, the Departing Member will accept an amount equal to what is paid to Nick Rivecca in salary, compensation and/or distribution for equity as payment in full. The Company and Brian will sign a full subordination of obligations on the Note to a financial institution providing financing to the Company, in form acceptable to the financial institution.

4. <u>Effect on Agreements</u>.

(a) <u>Operating Agreement</u>. The Departing Member and/or Brian shall no longer have any rights under or pursuant to the Operating Agreement, including without limitation, any rights to distributions or any rights to be paid any consideration for his Interest under the Operating Agreement or otherwise. The Departing Member and the Company hereby waive the application of Sections 1-5 of the Operating Agreement to the transfer of the Departing Member's Interest pursuant to this Agreement.

(b) <u>Resignation as Manager, Etc</u>. The Departing Member and/or Brian hereby resign as Manager of the Company and resign any and all other positions Brian may hold as an officer, manager, director or employee of the Company.

(c) <u>Brian's Company Vehicle</u>. Brian is currently using a 2016 Cadillac Truck (the "<u>Truck</u>") owned by the Company. The Company will transfer title to the Truck to Brian, subject to an outstanding lien and indebtedness in favor of GM Financial of Wisconsin in the amount of approximately $26,000. Brian and the Company agree that the value of the Truck is approximately $73,000. Brian will be responsible for and make all remaining payments on the indebtedness to GM Financial of Wisconsin.

(d) <u>Outstanding Promissory Notes</u>. Other than the amount addressed in paragraph 4(c), nothing contained in this Agreement will reduce or affect the terms of the Promissory Note in the principal amount of $300,000 in favor of the Brian dated December 21, 2017 (the "<u>2017 Promissory Note</u>"), provided however, the 2017 Promissory Note will have the same restrictions on payment postponement as the Note as described in paragraph 3 above. It will also be subordinated to any financial institutions that lend to the Company in form acceptable to these institutions.

5. <u>Representations, Warranties and Covenant of the Departing Member</u>.

(a) <u>Ownership</u>. The Departing Member represents and warrants to the Company that it is the sole and exclusive record and beneficial owner of the Interest, and the

2

same is owned by it free and clear of any liens, restrictions, encumbrances, or interests of any other person whatsoever, except for those restrictions set forth in the Operating Agreement. The Interest constitutes all of the interest in the Company of any nature owned by the Departing Member, Brian or any member of his family or in which Brian or any member of his family has or claims any beneficial interest as of the date hereof. The Departing Member has the full and unrestricted right to sell and transfer the Interest as herein provided, and neither such sale, nor any other provisions of this Agreement nor any of the transactions contemplated hereby requires the consent of any third person under, or will constitute a breach or default (or with the passing of time or the giving of notice would constitute any breach or default) under any agreement, instrument or document to which the Departing Member is a party or by which the Departing Member or Brian is bound.

(b)     No Reliance on Company Representations. The Departing Member acknowledges that in entering into this Agreement and selling the Interest on the terms provided herein the Company and Brian have not relied upon any representation or statement made by the Company or any of its officers, managers, members, or advisors (including attorneys or accountants) with regard to the value of the Company or the Interest, and that in determining to accept the Redemption Consideration provided herein the Departing Member has relied solely upon Brian's own independent judgment as to the value of the Interest (based upon information available to him by reason of his positions as a manager and member of the Company). The Departing Member and Brian recognize that the value of the Company is speculative and subjective and could be affected substantially (positively or negatively) by future events that cannot be predicted at this time. The Departing Member acknowledges that by agreeing to sell the Interest on the terms provided herein, it is foregoing the opportunity to participate in any future appreciation in the value of the Company (if any such appreciation occurs).

(c)     Liabilities. The Departing Member and Brian have not, in their capacity as a member, manager, officer, employee or agent the Company, or in any other capacity, (i) caused the Company to become a party to or obligated under any contract, agreement, document, or instrument under which the Company has any remaining liability or obligations (current or deferred, actual or contingent) as the date hereof or under which it may have any liability or obligation in the future, or (ii) caused the Company to incur any other obligations or liabilities whatsoever except those that were incurred in the ordinary course of the Company's business, and in any event not for the benefit of or involving the Departing Member (collectively, "Unauthorized Obligations").

(d)     Actionable Conduct. The Departing Member and Brian have not engaged in any conduct, act or omission that would subject the Company to any liability to any third person or persons ("Actionable Conduct").

6.      Representations and Warranties of the Company. The Company represents and warrants that it has the full and unrestricted right to purchase the Interest as herein provided, and neither such purchase, nor any other provisions of this Agreement nor any of the transactions contemplated hereby requires the consent of any third person under, or will constitute a breach or default (or with the passing of time or the giving of notice would constitute any breach or default) under any agreement, instrument or document to which the Company is a party or by which the Company is bound.

3

7. Release.

    (a)   Release of Company. Except as set forth in Section 7(b) below, the Departing Member and Brian hereby forever and irrevocably release and discharge the Company and the Company's present, past and future officers, managers, and members (collectively, "Company Releasees") from any and all claims, counterclaims, demands, actions, debts, rights, controversies, contracts, liabilities, damages or causes of action whatsoever, known or unknown, in law or in equity, asserted or not asserted, which the Departing Member or Brian now have, have, ever had, or may at any time hereafter have against any of the Company Releasees by reason of any matter, cause or event whatsoever occurring prior to the date hereof. This release includes, but is not limited to: (i) claims made under Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Americans With Disabilities Act of 1990, as amended; the Wisconsin Fair Employment Act, as amended; the Employee Retirement Income Security Act of 1974, as amended; Executive Order 11246; the Wisconsin Fair Employment Act; the Wisconsin Family and Medical Leave Act; the Federal Family and Medical Leave Act; and any other law relating to employment matters or employment discrimination; (ii) claims based on breach of contract (express or implied), tort, personal injury, harassment, defamation or wrongful discharge; (iii) claims relating to the Departing Member's ownership of the Company or the Company's repurchase of the Interest; (iv) claims to any additional compensation or payments from the Company; and (v) any other claims arising out of or connected with the Departing Member's or Brian's relationship with or separation from the Company.

    (b)   Exceptions. The release set forth in Section 7(a) above shall not apply to any liabilities arising under this Agreement or the 2017 Promissory Note.

    (c)   Agreement Not to Sue. To the fullest extent permitted by law, Departing Member hereby agrees not to initiate or cause to be initiated any arbitration or any federal, state or local lawsuit or administrative proceeding against the Company based on any transaction, matter, event, cause or thing whatsoever occurring prior to or on the date of this Agreement, except as provided in Section 7(b) above.

8.   Return of Information. The Departing Member and Brian represent, warrant and covenant that (i) they have returned to the Company and not retained (in any form or medium, including electronic copies on any computer, drive or other storage medium that remains in his possession) any records, files (including without limitation computer files, disks, data and tapes), manuals, reports, notes or any other materials, whether prepared by him or others, or any copies of the same, which contain information regarding the Company, its clients, transaction in which it or its clients have been, are or may be involved, or its business, (ii) they have returned to the Company all of the property of the Company, including without limitation any keys, cell phones, mobile devices and credit cards of the Company, and (iii) they have been paid all compensation and received all benefits due to them as a result of their services to the Company or their separation from the Company.

4

9. <u>Covenant Not to Compete; Non-Solicitation.</u>

(a) Departing Member and Brian agree that, during the two (2) year period following the date hereof, they will not directly or indirectly, as a principal, agent, owner, stockholder, employee, trustee, beneficiary, distributor, partner, co-venturer, officer, director, member, manager, independent contractor, or in any other capacity:

(i) own, operate, manage, join, finance, control, participate in the ownership, management, operation or control of, or be paid or employed by or acquire any securities of, or otherwise become associated with or provide assistance to any entity, firm, business, activity or enterprise which is engaged in the business of providing ready mix concrete (a "Competitive Business") if that Competitive Business has an office or services customers anywhere within the State of Wisconsin (the "Territory");

(ii) divert or attempt to divert any business from the Company or engage in any act calculated or likely to cause or induce any present or future client of the Company to discontinue, diminish or curtail its business with the Company or to do business with a Competitive Business in lieu of the Company, within the Territory; or

(iii) sell or solicit to sell, or attempt to sell or solicit to sell services competitive with those of the Company to any person (or any affiliate of any person) who or which has been a client of the Company during the five (5) years preceding the date of this Agreement, or contact or attempt to contact any such person for such purpose.

(iv) Notwithstanding the provisions of subsections (i)-(iii) above, Departing Member may (A) acquire securities of any entity the securities of which are publicly traded, provided that the value of the securities of such entity held directly or indirectly by Departing Member immediately following such acquisition is less than five-percent (5%) of the total value of the then outstanding class or type of securities acquired, and (B) own, operate, manage, join, finance, control, participate in the ownership, management, operation or control of, or be paid or employed by or acquire any securities of, or otherwise become associated with or provide assistance to an entity that is engaged in a Competitive Business if such entity is also engaged in other businesses that are not Competitive Businesses and the Departing Member's association and involvement with such entity is limited exclusively to those of its businesses which are not Competitive Businesses.

(b) Departing Member and Brian agree that for a period of one (1) year following the Effective Date of this Agreement, Departing Member and Brian shall not undertake any efforts to solicit or in any way assist any other person's efforts to solicit or attempt to solicit, induce or attempt to induce any employee or independent contractor of the Company or any of its affiliates to leave the employ of or terminate or otherwise adversely alter such person's relationship with the Company or any of its affiliates, or in any way interfere with the

5

relationship between the Company or any of its affiliates and any such person; provided, that solicitation through the use of general advertising or other means directed to the public generally and not targeted specifically toward the Company or one or more of its employees or independent contractors, including the placement of advertisements in newspapers and online, and the hiring of persons who respond to such general solicitation, shall not be deemed to violate this Section 8(b).

10.    Confidentiality.

(a)    Nondisclosure; Ownership of Confidential Information.  For a period of five (5) years after the date hereof, the Departing Member and Brian will keep in strict confidence and not, directly or indirectly, make known, disclose, furnish, make available or use any "Confidential Information" (as that term is defined below) of the Company.  The Departing Member and Brian acknowledge and agree that all documents and other property including or reflecting Confidential Information furnished to them by or obtained by them from the Company or any of its customers, members, officers, directors, agents or employees, or otherwise acquired or developed by them or known by them shall at all times be and remain the sole and exclusive property of the Company or its customers, as the case may be.  If the Departing Member or Brian discover any such documents or other property after the date hereof, they shall promptly turn same over to the Company.  If the Departing Member or Brian is required to disclose Confidential Information pursuant to any applicable law or court order, they will provide the Company with prior written notice of the requirement for disclosure as well as the documentation requiring same, if allowed by law and will cooperate with the Company to preserve the confidentiality of such information to the extent possible.

(b)    "Confidential Information."  For purposes of this Agreement, "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that is or was disclosed to, or developed or learned by, the Departing Member or Brian in connection with their relationship with the Company or any of its customers prior to the date hereof, and that relates to the actual or anticipated business, products, services, or financing of the Company or its clients.  Confidential Information includes, but is not limited to, the following: (i) internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods); (ii) trade secrets, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and (iii) inventions, innovations, improvements, developments, methods, designs, analyses, reports and all similar or related information. Confidential Information does not include information that (a) is or becomes publicly known through no wrongful act or breach of obligation of confidentiality by the Departing Member or Brian; (b) was rightfully received by the Departing Member or Brian from a third party (other than the Company or any of the Company's members, agents, independent contractors, employees or clients) without a breach of any obligation of confidentiality by such third party; or (c) was known to the Departing Member or Brian prior to their association with the Company.

(c)    Common Law of Torts or Trade Secrets.  In addition to the express obligations of confidentiality set forth in this Agreement, and notwithstanding the five-year

6

limitation otherwise applicable under Section 9(a), the Departing Member and Brian acknowledge that the Company will retain all such rights, and that they will be bound by all such duties, to protect the Company's Confidential Information, as are or may be provided under the law, including without limitation the Wisconsin Trade Secrets Act (Wis. Stat. §134.90), for so long as such information remains a Trade Secret under such law. Nothing herein will diminish the Company's common law and statutory rights to:

> (i)     keep such information secret for as long as the law allows;

> (ii)     protect such information from disclosure to any third party, wherever located;

> (iii)     protect such information from use by any person, including the Departing Member and Brian, not authorized by the Company; and

> (iv)     seek any remedies and take any measures necessary to protect the Company's Confidential Information.

11.     <u>Restrictions Reasonable; Injunctive Relief</u>.  The Departing Member and Brian acknowledge and agree that the restrictions set forth in Sections 8 and 9 are founded on valuable consideration and are reasonable in duration and geographic area in view of the circumstances under which this Agreement is executed (including the scope of the Company's current and anticipated future businesses and the extent of the Departing Member's and Brian's knowledge of the Company's business and its business strategies), and that such restrictions are necessary to protect the legitimate interests of the Company and the value of its business.  In the event that any provision of Section 8 or 9 is determined to be invalid by any court of competent jurisdiction, such provision shall be deemed to have been amended (and the parties will execute any documents and take whatever action is necessary to evidence such amendment) so as to eliminate or modify any such invalid provision and to carry out the intent of Sections 8 and 9 and render the terms and provisions of those Sections enforceable in all respects as so modified.  The Departing Member and Brian acknowledge and agree that irreparable injury will result to the Company and/or its clients in the event the Departing Member or Brian breaches any covenant contained in Section 8 or 9, and that the remedy at law for such breach will be inadequate. Therefore, if the Departing Member or Brian engage or threaten to engage in any act in violation of the provisions of Section 8 or 9, the Company shall be entitled, in addition to such other remedies and damages as may be available to it by law or under this Agreement, to injunctive or other equitable relief to enforce such provisions.

12.     <u>Nondisparagement</u>.  The Departing Member and Brian shall not make "Disparaging Remarks" (as defined below) about the Company, its officers, directors, managers or members; provided, however, that Departing Member and Brian may give truthful statements or testimony about the Company if they are subpoenaed to do so or in response to any inquiry from any government official.  "Disparaging Remarks" for this purpose shall be defined as any statement (other than a truthful statement of objective facts that could have been determined from other, independent sources accessible to the person to whom the statement was made) that a reasonable person would consider to impugn or call into question in a negative manner the business or personal ethics, reputation, character or integrity of the person or entity that is the

7

subject of the statement (the "Subject") or impugn or call into question in a negative manner the quality of the Subject's business, products, services or practices, and which, taking into consideration the context in which and the person to whom the statement was made, could reasonably be expected to have a material, adverse effect on the Subject or its business.

13. _Entire Agreement; Modification_. This Agreement and the ancillary agreements referenced above embody the entire agreement of the parties with respect to the transactions contemplated hereby and may not be modified or terminated except in a writing signed by the parties.

14. _Severability_. The provisions contained in this Agreement shall be deemed to be separable and severable, and in the event any one or more of the terms or provisions contained herein are determined for any reason to be invalid, illegal, or unenforceable, such determination shall not affect the validity or enforceability of the remaining provisions, and the rights and obligations of the parties shall be construed and enforced as though the Agreement did not contain such invalid term or provision.

15. _Headings_. The headings used in this Agreement are for informational purposes only and shall not be used to construe the intent of this Agreement.

16. _Counterparts_. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17. _Governing Law_. This Agreement has been executed in, and the validity, construction, interpretation, and enforcement hereof shall be governed by the laws of the State of Wisconsin.

18. _Legal Counsel_. Departing Member and Brian acknowledge that the law firm of Husch Blackwell LLP has represented the Company and Nick Rivecca in connection with the negotiation and drafting of this Agreement, and has not represented or provided any advice to the Departing Member or Brian. They further acknowledge that they have been represented by Niebler, Pyzyk, Carrig, Jelenchick & Hanley LLP in connection with the negotiation and drafting of this Agreement.

**[SIGNATURE PAGE TO FOLLOW]**

8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**DEPARTING MEMBER:**                                    **COMPANY:**

SONAG COMPANY, INC.                                      SONAG READY MIX, LLC

By: _____                           By: _____
Name: Brian Ganos                                        Name: Nick Rivecca
Title: CEO                                               Title:  Member


**BRIAN:**

_____
Brian Ganos, as an individual

9

# PROMISSORY NOTE

$739,578.66                                                    February _18_, 2018

FOR VALUE RECEIVED, the undersigned Sonag Ready Mix, LLC, a Wisconsin limited liability company (the "**Borrower**"), promises to pay to the order of Sonag Company, Inc., a Wisconsin corporation (the "**Lender**"), the principal sum of Seven Hundred Thirty Nine Thousand Five Hundred Seventy Eight Dollars and 66/100 ($739,578.66).

1.     **Redemption Agreement**. This Note is subject to the terms and conditions of a Redemption Agreement dated February _19_, 2018, by and among Sonag Ready Mix, LLC, Sonag Company, Inc. and Brian Ganos (the "**Redemption Agreement**").

2.     **Interest.** Interest will accrue on the unpaid principal balance at a rate equal to 2.31% per annum.

3.     **Maturity.** Borrower shall pay all principal and accrued interest on February __, 2023 (the "**Maturity Date**"), except as set forth in Section 6 below.

4.     **Calculation of Interest.** Interest will be computed for the actual number of days principal is unpaid, using a daily factor obtained by dividing the stated interest rate by 365.

5.     **Maximum Rate.** In no event will the interest rate hereunder exceed that permitted by applicable law. If any interest or other charge is finally determined by a court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted by law, and the Lender may credit any excess amount collected against the balance due or refund the amount to the Borrower.

6.     **Prepayment.** This Note may be prepaid in full at any time. At the time of prepayment Borrower shall pay all outstanding principal and the balance of the accrued interest.

7.     **Payments.** Borrower shall repay this Note as provided in paragraphs 2 and 3 of the Redemption Agreement. If the Borrower elects to make weekly payments, they shall be in the amount of $3,173.08 per week.

8.     **Default.** Any delay in payments on this Note allowed by the Redemption Agreement, including but not limited to, failure to pay off the Note on the Maturity Date, shall not be a default under this Note.

9.     **Waivers; Relationship to Other Documents.** All Borrowers, endorsers, and sureties waive presentment, protest, demand, and notice of dishonor. The warranties, covenants and other obligations of the Borrower (and rights and remedies of the Lender) in this Note and all related documents are intended to be cumulative and to supplement each other.

10.     **Applicable Law and Jurisdiction; Interpretation.** This Note shall be governed by and interpreted in accordance with the internal laws of the State of Wisconsin, except to the extent superseded by Federal law. Invalidity of any provisions of this Note shall not affect any other provision. THE BORROWER AND THE LENDER HEREBY CONSENT TO THE

Exhibit 3

JURISDICTION OF THE STATE OF WISCONSIN OR FEDERAL COURT SITUATED IN THE COUNTY OR FEDERAL JURISDICTION IN WISCONSIN AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, WITH REGARD TO ANY ACTIONS, CLAIMS, DISPUTES OR PROCEEDINGS RELATING TO THIS NOTE, OR ANY TRANSACTIONS ARISING THEREFROM, OR ENFORCEMENT AND/OR INTERPRETATION OF ANY OF THE FOREGOING. Nothing herein shall affect the Lender's rights to serve process in any manner permitted by law.

11.  **Waiver of Jury Trial.**  THE BORROWER AND THE LENDER HEREBY JOINTLY AND SEVERALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS THEREUNDER, ANY COLLATERAL SECURING THE OBLIGATIONS, OR ANY TRANSACTION ARISING THEREFROM OR CONNECTED THERETO.  THE BORROWER AND THE LENDER EACH REPRESENTS TO THE OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.

(Signature Page Follows)

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date and year first written above.

SONAG READY MIX, LLC
a Wisconsin limited liability company

By: _Nick Rivecca_ _____
Nick Rivecca, Member

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Place an "X" in the appropriate box: ☐ Green Bay Division ☒ Milwaukee Division

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | ALL FUNDS DEPOSITED INTO THE USDOJ'S SEIZED ASSET DEPOSIT FUND FOR 19-DCI-000029 UNDER THE MARCH 1, 2019 RESTRAINING ORDER ISSUED IN CASE NO. 18-CR-62 |

**(b)** County of Residence of First Listed Plaintiff _____

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Milwaukee

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott J. Campbell, AUSA
US Attorney's Office, #530 Federal Building
517 E. Wisconsin Avenue, Milwaukee, WI 53202  (414-297-1700)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability    ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander    Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability    Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine    ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability    Injury Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle    **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability    ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury    ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice    ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting    **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations    ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment    ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other    ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| |    ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC § 981(a)(1)(A)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Lynn Adelman

DOCKET NUMBER   18-CV-519; 17-CV-208; et al

DATE
10/01/2019

SIGNATURE OF ATTORNEY OF RECORD
s/SCOTT J. CAMPBELL

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.                              Case No.

ALL FUNDS DEPOSITED INTO THE UNITED
STATES DEPARTMENT OF JUSTICE'S SEIZED
ASSET DEPOSIT FUND FOR 19-DCI-000029
UNDER THE MARCH 1, 2019 RESTRAINING
ORDER ISSUED IN CASE NO. 18-CR-62 (E.D.
WIS.),

                Defendant.

## WARRANT FOR ARREST IN REM

To:    THE UNITED STATES MARSHAL
        Eastern District of Wisconsin

WHEREAS, a Verified Complaint for Civil Forfeiture *in rem* was filed on the 1st day of

October, 2019, by the United States Attorney for the Eastern District of Wisconsin, which seeks

the forfeiture of the above-named defendant property pursuant to Title 18, United States Code,

Section 981(a)(1)(A), and which prays that process issue to enforce the forfeiture and to give

notice to all interested parties to appear before the court and show cause why the forfeiture

should not be decreed; and due proceedings being had, that the defendant property be

condemned and forfeited to the use of the United States of America.

YOU ARE THEREFORE HEREBY COMMANDED to attach and arrest the following

defendant property, which is presently in the custody of the United States Marshal Service in

Milwaukee, Wisconsin, in the Eastern District of Wisconsin, and to detain the same until further order of this Court:

> All funds deposited to date, and to be deposited in the future, into the United States Department of Justice's Seized Asset Deposit Fund, for asset identification number 19-DCI-000029, under the March 1, 2019 Restraining Order issued in Case No. 18-CR-62 (E.D. Wis.)

Dated this _____ day of October, 2019, at Milwaukee, Wisconsin.

STEPHEN C. DRIES
Clerk of Court

By: _____

Deputy Clerk

## Return

This warrant was received and executed with the arrest of the above-named defendant.

Date warrant received: _____

Date warrant executed: _____

Name and title of arresting officer: _____

Signature of arresting officer: _____

Date: _____

2